IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

OLDHAM GRAPHIC SUPPLY, INC., an )
Illinois Corporation, d/b/a THE OLDHAM )
GROUP, )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )        No.  09-1250-WEB-KMH
                                     )
CHARLES DAVID CORNWELL,              )
                                     )
                    Defendant.       )
_____)

### Memorandum and Order

This matter came before the court on August 28, 2009, for a hearing on the plaintiff's motion for preliminary injunction.  The court heard evidence and took the matter under advisement.  On September 4, 2009, the parties filed proposed findings of fact and conclusions of law.  Having reviewed the evidence and the parties' positions, the court is prepared to rule.

Jurisdiction is appropriate in this court pursuant to 28 U.S.C. § 1332(a), as the dispute is between citizens of different states and the amount in controversy exceeds $75,000.

**I.  _Summary of Evidence & Findings_**.

Based on the record before the court and the evidence presented at the August 28, 2009 hearing, the court makes the following findings.

Plaintiff Oldham Graphic Supply ("Oldham") filed a verified complaint on August 13, 2009, asserting that Charles David Cornwell, a former employee of Oldham,  is in breach of a non-competition agreement he signed when he was an employee.  The complaint and accompanying motion seek an injunction prohibiting Mr. Cornwell from performing certain

work for a competitor of Oldham's until the dispute can be arbitrated.

Oldham is in the business of selling graphic arts, printing supplies and equipment, and wide format supplies and equipment to the commercial printing and signage industries. It is headquartered in Springfield, Illinois.

A. Cornwell's Employment with Oldham.

Defendant Dave Cornwell was first employed by Oldham in May of 2004 as an account manager. Cornwell had extensive experience at the time selling graphic arts supplies. From 1974 to 1992, he sold supplies for Western Paper in the Wichita area and southeastern Kansas. He left Western Paper in 1992 to work for Lawrence Photo, where he stayed until 2004 when the company was bought out and the Wichita branch was being closed. Cornwell was approached by John Bober, a general manager for Oldham, about selling graphic arts supplies for Oldham. Cornwell had not heard of Oldham. At that time it did not do any significant business in the Wichita area.

Cornwell had a number of existing accounts – he estimated 50 – that he brought with him to Oldham in May of 2004. In September of 2007, Cornwell became the general manager of Oldham's Springfield, Missouri, branch office. The parties executed an At-Will Employment Agreement (Pl.Exh. 1) in September of 2007. The agreement provided, among other things, that Cornwell was an at-will employee, that he would be paid a base salary plus a specified commission, and that he would enter into a non-compete agreement as a condition of his employment. It also provided that any dispute arising out of the agreement would be settled by arbitration, except that Oldham could obtain an injunction for any breach of the non-compete agreement. About a week after signing the At-Will agreement, the parties signed a "Non-

2

Competition and Non-Solicitation Agreement." [hereinafter "the Non-Compete Agreement"] (Pl. Exh. 2).

The At-Will Employment Agreement included a provision promising Cornwell a 24% commission on his consumable sales and a 10% commission on equipment sales, as well as a payment of $1,000 per month.  The agreement stated that Cornwell was receiving what amounted to an extra 2% commission on consumables and the $1,000 per month payment "for his branch management duties in the Springfield, MO office."  The benefits promised in the agreement included 2 weeks vacation, health insurance, and a 401k plan and profit sharing consistent with the company's 401k program. It also stated that the company would reimburse the employee on all business related expenses.

The At-Will Employment Agreement provided that it could not be modified or discharged orally, but only by an agreement in writing signed by the party against whom enforcement of any change was sought.

The Non-Compete Agreement signed by the parties in September 2007 provided in part:

3.1    During the Term of this Agreement, Employee shall not, directly or indirectly, enter into or engage in a business or activity which competes, directly, indirectly or in any manner whatsoever, with the Company's Business, either as an individual for his own account or as an employee, agent, officer, director, or member of any association, corporation, partnership, firm or business entity of any type.  Employee shall be bound by the terms of this paragraph without geographic limitation.

3.2    For a period of two (2) years after the Term of this Agreement, Employee shall not, directly or indirectly, enter into or engage in a business or activity which competes, directly, indirectly or in any manner whatsoever, with the Company's Business, either as an individual for his own account or as an employee, agent, officer, director, or member of any association, corporation, partnership, firm or business entity of any type.  The terms of this paragraph shall prohibit such activity within a 200 mile radius of each Oldham Graphic Supply office.

3.3    For a period of two (2) years after the Term of this Agreement, Employee shall not, directly or indirectly, enter into or engage in any business or activity with any customers or

clients of the Company with which Employee has had contact at any time during the Term of this Agreement, including, but not limited to, those customers and clients listed in Exhibit "A" attached hereto.

Exhibit A attached to the Agreement was entitled "Existing Customers of Company for Which Employee is Responsible." It provided:

"The Employee will come into contact with confidential information of the Company while in the performance of his duties; therefore, any existing assigned accounts and accounts transitioned over to the Company during Term of Employment that Employee has any informational knowledge or any contact." [sic]

Cornwell testified that when Oldham Vice-President Jerry Collins offered him the General Manager position, Collins told him he had to sign the Non-Compete Agreement. Cornwell has since learned that several other employees with access to similar pricing information as Cornwell were not required to sign such agreements. Jerry Collins testified this was due to the fact that the company's non-competition policy did not go into effect until the end of 2004, so employees hired before that time were not required to sign a non-compete agreement.

B. Oldham's Offices.

The Oldham Springfield office was responsible for Oldham's sales in Missouri, Kansas, Oklahoma, and Arkansas. On average, Cornwell was only in the Springfield office one or two days a month. Otherwise, he worked out of an office in his home in Augusta, Kansas. He supervised other account representatives and also maintained his own accounts. Most of Cornwell's accounts were located in the Wichita area.

Cornwell's Augusta residence was not listed as an Oldham office in the Wichita area phone book. Jerry Collins testified that the company considered Cornwell's residence to be an Oldham office, and that the company paid Cornwell $500 per month for general office expenses. Cornwell contradicted this, saying the company only paid for his internet service, which was less

4

than $70 per month, and for a cell phone, as it did for most of its sales representatives regardless of where they worked. Cornwell said he told customers that he was located in the Wichita area, but denied ever telling customers that Oldham had a Wichita office. He did list himself on a business website ("Linked-In") as an Oldham representative in the Wichita area. Oldham introduced some promotional literature in which it represented to customers that its "Sales Offices" included Wichita, Kansas, although no address or contact information was provided for that office. The company's website, however, did not list Wichita among the company's offices. Moreover, Cornwell showed at the hearing that the promotional literature cited by Oldham was largely inaccurate or out of date insofar as its listing of sales offices was concerned. Oldham produced no documentary evidence to support the assertion that it paid Cornwell $500 per month to maintain an office or for office expenses. Oldham did not keep any inventory at Cornwell's residence or in the Wichita area.

Jerry Collins testified that since the defendant's departure from the company, Oldham has hired a new sales representative, Tony Goff, who works out of his residence in Wellington, Kansas, which is located about 30 miles south of Wichita. Collins testified that Oldham considers the home offices of its sales representatives to be Oldham offices within the meaning of the company's non-compete agreement.

C. Confidential Information.

As a General Manager, Cornwell was provided with weekly and monthly sales reports regarding all sales by sales representatives attached to the Springfield, Missouri branch. Those reports included information for all sales by each representative, including customer name, identification of each product purchased, unit price, unit cost, quantity ordered, quantity shipped,

5

the extended price of the goods purchased, the extended costs of the goods purchased, the profit margin percentage, gross profit, commission rate, and the dollar amount of the transaction. Unlike the defendant, sales representatives only received such information on their own sales, and not sales by other representatives.

John Gryder, Oldham's National Sales Manager, testified that the price charged by Oldham to its customers is not confidential. If the customer wants to share that information with others, it is free to do so, and in fact it is common for customers to share pricing information amongst themselves. Additionally, Oldham's customers sometimes share such pricing information with competitors of Oldham in order to obtain a better deal. Customer pricing information also changes fairly frequently.

The names of and contact information for Oldham's customers and suppliers are generally known by other competitors in the area. As such, this information is not really confidential in nature. Similarly, Cornwell had access to backorder reports and aging reports, which included such information as customer account balances and payment history, but no clear evidence has been presented to show that knowledge of such information provides any significant competitive advantage.

As a manager, Cornwell also had access to confidential information regarding "contract sales" or "price letter" arrangements whereby Oldham entered into contracts with certain manufacturers, such as Kodak, to obtain products at a substantially discounted cost for resale to a particular customer, based on the customer's commitment to purchase certain quantities. The price at which the manufacturer sells these products to Oldham for resale (i.e. Oldham's cost) is regarded as confidential by the manufacturer as well as Oldham. About 60% of Oldham's

6

business involves contract pricing.  Pursuant to a contractual arrangement with Kodak, Oldham was provided with special pricing on products for specific customers.  These arrangements were reflected in a price letter (Pl. Exh. 10) for each customer, which identified the contract termination date and listed specific products and Kodak's standard pricing for those products, as well as the special contract price at which Kodak agreed to make the products available solely to Oldham, as the reseller of record.  The contract price is Oldham's cost for those products, and that information is not revealed to customers.

The "contract pricing" reflected in a price letter is information developed by Kodak.  The contract pricing information is generally treated as confidential by Oldham and by Kodak, but Kodak does share that information with Oldham's competitors under certain circumstances.  Moreover, vendors regularly engaged in the business of selling these types of supplies have a fairly good idea of the margins typically associated with such products.

Kodak has a "Price-Letter Access Policy," which controls how Kodak deals with "the sharing of special end-user customer pricing ... from one reseller to another."  Kodak accepts only written requests from end-user customers to share that customer's contract pricing with one or more new distributors.  Within 30 days of such a request, Kodak notifies the current distributor of the request, who is given 30 days to remedy the situation before Kodak will give its pricing to any new distributor.  Kodak reviews the request and may seek further information regarding "the business conditions that are driving the request." If at the end of the 30-day period the customer still wishes to have the special pricing shared with other distributors, Kodak may add the new distributor to the price letter, subject to certain conditions, including the new distributor paying a $1,000 administrative fee to Kodak.  Kodak reserves the right to decline to

add a distributor to a price-letter.

In addition to contract pricing information, Cornwell was provided with information regarding Oldham's private label products, which Oldham acquires and sells under its own label. Cornwell was privy to the identity of the suppliers of those products and to information regarding the characteristics of the products themselves, as well as Oldham's cost for the products.

Oldham took reasonable steps to protect the confidentiality of its information by instructing employees that the information was confidential and by limiting the flow of the information to those persons who needed to have the particular information. It distributed a Business Conduct Guide to employees that clearly informed employees they were to protect confidential information, and mentioned, among other things, sales data, customer lists, and sensitive financial information.

D.  <u>Changes in Compensation and Cornwell's Resignation</u>.

From time to time, Oldham has changed the commission structure under which it pays its employees. It made a change in January of 2008 after providing 90-days notice to employees. In November of 2008, it notified employees of additional changes, with these changes taking effect for January 2009 sales.

The changes for January 2009 included a graduated reduction of commission percentage, based on the age of the customer's invoice, as well as the institution of sales quotas. As long as customers paid on time and the employee's quota was met, the employee's commission would not be reduced. For invoices that were paid between 45 and 60 days after invoice, however, the employee's commission would be reduced 2%. Accounts paid between 61-90 days resulted in a

4% commission reduction; between 91-120 days there was a 12% reduction; and for accounts paid after 120 days (or not at all) no commission would be paid.

The evidence was not entirely clear as to how much these reductions differed from industry custom or from historical practices at Oldham.  Mr. Cornwell testified that in the industry generally, it was common for a sales representative to be "dinged" – i.e. his commission would be taken away or reduced – if a customer was late in paying the bill or if the customer failed to pay the bill at all.  The evidence shows reductions of this type were adopted at Oldham at least as of January 2008 and were increased to some degree in January 2009.

Oldham's consideration of sales quotas in the payment of commissions was a new practice in January of 2009.  Under the new policy, individual sales quotas were established, and the payment of commissions was affected by the employee's level of sales relative to his quota. An employee who exceeded 110% of his quota would receive an additional 2% commission. Normal commission would be paid if the employee was between 90-109% of quota.  If the employee was between 80-89% of quota, the commission would be reduced by 4%.  An employee whose sales were less than 79% of quota would have his commission reduced by 7%.

The practical effect of these changes was to reduce Cornwell's compensation by nearly half, despite the fact that Cornwell's sales from January to March of 2009 had increased by 5% over the previous year.

After the adoption of these changes, Cornwell had discussions with John Gryder, Oldham's national sales manager, to protest the reduced compensation.  He also sent an email to Jerry Collins.  He was complaining on behalf of himself and the sales representatives at the Springfield, Missouri, office.  According to Cornwell, Gryder responded by saying that he was

9

suffering too, that everyone had the same problem, and that everyone was in it together. Cornwell complained to Gryder about the compensation on another occasion, telling him that one of the sales reps was cashing in CD's in order to pay his bills.  In response to such complaints, Oldham adjusted the sales quotas in April 2009 by reducing them to 2008 sales levels, but otherwise it did not change the new compensation policy.

Effective June 1, 2009, Oldham amended its 401k plan to discontinue its fixed matching contributions for employees.  The amendment made the employer's matching contributions discretionary with the company.

In response to additional complaints and rumors that Oldham was in financial trouble, Jerry Collins sent an email to employees on June 3, 2009, setting out what he viewed as positive changes at the company.  He said the company was making necessary changes and added: "If you are not willing to be with a company that is going to make necessary changes to make sure that our company will survive and continue to grow, I would recommend that you look for another job."

When Dave Cornwell saw the foregoing message, he took it to mean it was time for him to look for another job.  His commissions had already been reduced by about half, and he concluded he could not survive on that level of income.  He had depleted savings in order to get by and felt he had no choice other than to move on.  He is 57 years old, does not have a college degree, and is not trained in any other field.  He has sold graphic art supplies for most of his life and "this is all I know."

Sometime prior to June 26, 2009, and while still working for Oldham, Cornwell approached or talked to at least seven customers of Oldham.  The customers contacted included:

Calibrated Forms of Columbus, Ks.; Ennis of Fort Scott, Ks.; Main Street Graphics of Columbus; City Print, Inc. of Wichita; Rand Graphics of Wichita; CS&S of Wichita; and Quality Printing of Wichita.  He told them he was going to have to move to Xpedx and asked if they would be willing to come along and buy products from that company.  Cornwell had brought many of his accounts to Oldham initially, and he regarded them as his customers rather than Oldham's.  He testified that "customers buy from salesmen; they don't buy from companies."  Cornwell had apparently made arrangements prior to June 26, 2009 to work for Xpedx (formerly Western Paper, for whom Cornwell had worked previously).  Cornwell had also been in contact with James Struble, a representative of Kodak, regarding the procedure for a customer to request that another vendor be added to Kodak's "pricing letter."  Based on information from Struble, Cornwell told customers what to include in a letter to Kodak if they wished to change vendors. After the first customer, Calibrated Forms, provided a letter, Cornwell provided the same language to other customers.  As a result, Cornwell gathered seven letters from customers containing identical language that stated: "This is to inform you that we no longer wish to purchase our Kodak supplies from The Oldham Group.  We would like to use XPEDX as our source for future Kodak product purchases."  On June 29, 2009, while still employed by Oldham, Cornwell faxed the seven letters from his home office to Struble, using a fax cover sheet bearing Oldham's name.  Struble forwarded the fax by email to others at Kodak.

On or about July 1, 2009, Cornwell informed Jerry Collins that he was resigning from Oldham.  They discussed his Non-Compete Agreement, and Cornwell stated that he understood he had a restriction on competing within a 200-mile radius of the Springfield, Missouri, office. Collins did not assert at that time that the Agreement applied to a 200-mile radius around

11

Wichita.  Later the same day, the fax containing the seven customer letters was forwarded to Oldham by someone at Kodak.

Cornwell has been employed by Xpedx since July 1, 2009.  He testified that when he resigned from Oldham, he threw away the sales reports and all other documents from Oldham. Kenneth Hays, the branch manager for Xpedx in Wichita, testified that Cornwell did not provide Xpedx with Oldham's cost information on Kodak products.  Hays testified that Cornwell has solicited customers for Xpedx, but Xpedx is waiting to receive pricing letters from Kodak before making final proposals to customers.  If Xpedx is approved by Kodak, it will then have access to Kodak's pricing letter information.  Hays conceded that in order to make presentations to customers, Cornwell would need to know Kodak's price.  Hays assumes Cornwell knows those prices more or less "off the top of his head" because he called on those accounts for a long time while working for Oldham.

Kodak declined to act on the June 29, 2009 customer letters asking that Xpedx be added to Kodak's pricing letter.  (Pl. Exh. 17).  At least five of Cornwell's customers have since re-submitted requests asking for vendors other than Oldham to be added, and Kodak has followed its Price-Letter Policy with respect to those requests.  Kodak has notified Oldham of the requests and given Oldham 30-day notice to allow it to address outstanding issues with the customers.  As of the August 28th hearing, there was no evidence that Kodak had allowed any other vendor access to the price-letter information on any of Oldham's customers.[1]  As of August 28, 2009,

---

[1] Defendant's Proposed Findings of Fact assert that "as of the date of the court's ruling, Kodak has added Xpedx to its price-letter for those customers who have made those requests more than 30 days ago."  Doc. 15 at 12, ¶48.  This assertion is not supported by any specific citation to the record and the court finds no evidence to support it.  To the extent defendant is attempting to predict Kodak's actions, the finding appears to be speculative.

the 30-day notice period had not expired as to these customers.  The requests are in process, however, and may be allowed at the conclusion of the 30-day period.

Three of the foregoing customer requests asked that "other vendors" be allowed price-letter access.  One of the requests specifically asked for Xpedx, and one – Calibrated Forms – asked that another competitor (Pitman) be added.

Xpedx has assigned Cornwell a sales territory that consists of the Wichita area and western Kansas.  Ken Hays said that Cornwell's territory was designed to keep his customer contacts outside of a 200-mile radius from Springfield, Mo.

Jerry Colllins of Oldham testified that Cornwell's conduct affected Oldham's relationships with its customers and vendors.  John Gryder testified he was told by two customers that they were taking their business with Mr. Cornwell, and a third (Quality Printing) said they were going to split the business.

Oldham filed the instant suit on August 13, 2009.  On September 19, 2009, it filed a motion seeking to compel arbitration of all claims under the parties' contract.

## II.  *Standards for Preliminary Injunction*.

To obtain a preliminary injunction, the moving party must demonstrate four factors:  (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and  (4) that the injunction is in the public interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

If the latter three requirements tip strongly in the plaintiff's favor, the Tenth Circuit applies a modified test under which the plaintiff may meet the requirements for showing success

on the merits by showing that "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1195 (10th Cir.1999).  This modified test does not apply, however, in the case of certain disfavored preliminary injunctions.  *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2005).[2]

Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.  *Beltronics, USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).  The primary goal of a preliminary injunction is to preserve the pre-trial status quo until the merits can be heard.  *Id*. at 1071.

**III.  *Discussion*.**

(1).  *Likelihood of Success on the Merits*.  Oldham's claim is based upon defendant's alleged breach of his Employment Agreement and Non-Competition Agreement.  Doc. 1 at ¶¶ 37-38.  Both of these agreements provide that they will be governed by and construed under Illinois law.  Kansas courts generally give effect to such choice-of-law provisions, so the court will apply Illinois law to the agreement.  *See Key Constr., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 551 F.Supp.2d 1266, 1269 (D. Kan. 2008).

Under Illinois law, the general rule is that "where postemployment restrictive covenants are ancillary to valid contracts supported by adequate consideration, and are reasonable in their terms, such covenants will be enforced."  *Lifetec, Inc. v. Edwards*, 880 N.E.2d 188 (Ill. App. Ct.

---

[2] The court is not persuaded that the instant request for injunction involves one of the disfavored types of injunction.

14

2007).  Because such covenants operate as partial restrictions on trade, however, Illinois courts carefully scrutinize them.  *Baird and Warner Res. Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1014 (Ill. App. Ct. 2008).  They may be held valid and enforceable if the terms are reasonable and necessary to protect a legitimate business interest of the employer.  *Id.* (citations omitted). "Factors for a court to consider include the hardship caused to the employee, the effect upon the general public, the geographic and temporal scope of the restrictions, as well as the activities restricted, all of which necessarily turn on the facts of the case."  *Id.*  An employer seeking to enforce a restrictive covenant bears the burden of demonstrating that the full extent of the restraint is necessary for protecting its interests.  *Cambridge Engineering, Inc. v. Mercury Partners 90BI, Inc.*, 879 N.E.2d 512, 522 (Ill. Ct. App. 2007).  "Restrictions on activities 'should be narrowly tailored to protect only against activities that threaten the employer's interest.'" *Id.* at 525.

   <u>*Whether Non-Compete Agreement is Enforceable*</u>.  Defendant Cornwell first argues that the Non-Compete Agreement is unenforceable because it does not serve to protect any legitimate business interest of Oldham.  He argues Oldham is not seeking to protect any "near permanent relationships" with its customers, nor has it shown that Cornwell had access to any confidential information that would be protected by an injunction, such that it is unenforceable under Illinois law.  Oldham, by contrast, asserts that Cornwell "had extensive knowledge of a confidential compilation of valuable data concerning Oldham's sales, the identities of its customers, their needs, Oldham's profit margins, and its cost on products."  Doc. 16 at 17.  Moreover, "[d]espite conflicting testimony concerning the 'staleness' of some pricing information, the parties do not dispute the overall value of this compendium of knowledge, both to Oldham and to its

competitor Xpedx."  *Id.*

Numerous Illinois cases state that for a non-compete agreement to be enforceable, it must further a legitimate business interest of the employer.  *Baird and Warner Res. Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1014 (2008).  *But see  Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 201 (Ill. App. Ct. 2007)  *(Steigmann, J., concurring)* (arguing legitimate interest test is no longer valid).   A "legitimate business interest" exists only where (1) the employee acquired confidential information through his employment with the plaintiff and later attempted to use it for his own gains or (2) by the nature of the plaintiff's business, its customer relationships are near permanent and the employee would not have had contact with the customer absent his employment.  *Lifetec, Inc.,* 880 N.E.2d at 196.

Much of the information cited by Oldham does not appear to be confidential.  According to the evidence, the identity of Oldham customers and the prices Oldham charges those customers are known generally in the marketplace or are easily obtainable and are not confidential in nature.  *See e.g., A.J. Dralle, Inc. v. Air Technologies, Inc*., 627 N.E.2d 690, 697 (Ill. App. Ct. 1994) ("Where such information is known by others in the trade or could be duplicated easily by reference to industry publications or the identity of customers is known because the customers did business with more than one supplier, such information is not protectible.").  The prices that Oldham charges its customers also change frequently and cannot be considered confidential for that reason as well.  As for the history and needs of particular customers, such information could be confidential under certain circumstances, but in this case defendant Cornwell had extensive knowledge of most of his customers before he ever came to work for Oldham.  The evidence showed that Cornwell worked in the industry for years, he

16

developed most of his accounts prior to working for Oldham, and he brought a number of those accounts to Oldham in 2004 when he began working there.  Cornwell's personal relationships with pre-existing customers and his knowledge of their needs, as well as the competitive advantage that such knowledge and relationships provide, have not been shown to be a product of his employment with Oldham.  *ILG Industries, Inc. v. Scott,* 273 N.E.2d 393, 396 (Ill. 1971) ("One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience.").  *Cf. Hanchett Paper Co. v. Mechiorre*, 792 N.E.2d 395, 353 (Ill. App. Ct. 2003) (defendant came to plaintiff with no knowledge of the packing industry; he gained his knowledge through plaintiff and gained access to customers through the plaintiff).  One notable exception to this finding concerns the Rand account, which according to the evidence was developed largely during the time that  Cornwell worked at Oldham.  Oldham showed it had significant input in developing this account and that the size and success of the account was attributable to the efforts of a number of individuals other than the defendant.  *Transcript of Preliminary Injunction Hearing* at Pp. 190-91. Other accounts that Cornwell acquired during his tenure at Oldham include The Envelope Guys and Docuplex.  The defendant's knowledge about these customers and the goodwill acquired in connection with these accounts derive from his employment at Oldham, and the knowledge he acquired at Oldham would likely provide a competitive advantage.  Protecting such information and the goodwill associated with it is properly considered a legitimate business interest of Oldham.  *See The Agency, Inc. v. Grove*, 839 N.E.2d 606, 616 (Ill. App. Ct. 2005).

An additional question of confidentiality concerns knowledge of Oldham's costs and margins under price letter agreements.  The majority of Oldham's business is based on such

arrangements with suppliers, including Oldham's price letter agreements with Kodak.  These letters are treated as confidential by both Oldham and by Kodak, as they contain sensitive information showing what Kodak charges Oldham for its products.  Oldham's cost is not disclosed to customers, and a competitor who knows Oldham's costs or margins may be able to use that information to provide a lower bid to a particular customer.  The evidence suggests that customers buying products of the type sold by the plaintiff are driven in large part by cost considerations, and that they will buy from different sources if a better price is offered. Knowledge of Oldham's costs may thus offer a competitive advantage.  At the same time, this cost information likely changes with sufficient frequency that the defendant's current knowledge of it would become "stale" in short order and would provide no lasting advantage.  Moreover the information may be disclosed by Kodak to other suppliers.  In this limited sense, Cornwell's knowledge of Oldham's costs under its price letter agreements is confidential information.  The court also notes that since his departure from Oldham, Mr. Cornwell has apparently used his knowledge of Oldham's costs under Kodak price letters to solicit business from Oldham customers.  *See Transcript of Prelim. Injunction Hearing* at Pp. 186-87.  The court concludes that Oldham may have a legitimate business interest in protecting such information.  The court rejects defendant's contention that the Non-Compete Agreement is unenforceable because it fails to further any legitimate business interest.

The court notes that ¶ 3.3 of the Non-Compete Agreement in this case provides in part that defendant shall not engage in any business "with any customers or clients of the Company with which Employee has had contact at any time during the Term of this Agreement...."  An addendum says this includes "any existing assigned accounts and accounts transitioned over to

18

the Company during the Term of Employment that Employee has any informational knowledge or contact."[sic] The court notes that under Illinois law, a nonsolicitation clause is only valid if "reasonably related to the employer's interest in protecting customer relations that its employees *developed while working for the employer.*" *Cambridge Engineering Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 528 (Ill. App. Ct. 2007) (emphasis added).   The rule is clearly designed to prevent a former employee from exploiting the goodwill of a client or an account that was created at the employer's expense.  *See id.*  After considering all of the circumstances in this case, including the hardship of this particular non-compete restriction on the employee, the court concludes it would be unreasonable to restrict Mr. Cornwell from engaging in business with customers and accounts that he brought to Oldham in the first instance.  With the notable exception of the Rand account, Oldham has not shown that the goodwill associated with these accounts was due to its efforts.  On the contrary, the evidence suggests that Cornwell was responsible for bringing these accounts to Oldham.  There is no evidence that Oldham paid Cornwell anything for bringing the accounts in, except that Oldham promised to pay him a certain level of commissions on sales to those accounts.  Oldham subsequently cut his commissions, however, to a level that essentially forced him to resign.  Given the defendant's circumstances, it would be a significant hardship to prevent him from competing for the business of accounts he created in the first instance.  Moreover, it would be inequitable to allow such a restriction where Oldham essentially forced the defendant to resign by drastically reducing his commissions from what it promised to pay when he first brought those accounts to Oldham.  The court finds this restriction is unenforceable with respect to accounts that were established by the defendant prior to working at Oldham and that he brought to Oldham in the first instance.

Cornwell next contends the Non-Compete Agreement is "unreasonable in geographic scope, because it includes offices other than the one Cornwell managed."  Doc. 15 at 19.  It further argues Oldham is unlikely to prevail on its claim that the 200-mile restriction on competition applies to the Wichita, Kansas, area, or to other areas where Oldham sales representatives work out of their homes.  As to the latter argument, the court agrees with the defendant that the language of the agreement does not apply to the Wichita, Kansas area.  Section 3.2 of the Non-Compete Agreement provides in part that for two years after Cornwell's employment ends he will not compete with Oldham "within a 200 mile radius of each Oldham Graphic Supply Office."  The natural meaning of the phrase "Oldham Graphic Supply Office" would not include the defendant's residence or the residence of other Oldham sales representatives.  While these employees may have had "offices" in their homes, those premises were in no sense owned or operated by Oldham.  There is no evidence that the home offices were listed or held out publicly as Oldham offices (with the minor exception of some non-specific promotional literature) or that the company itself treated the residences as Oldham offices.  The defendant may have performed work for Oldham out of his home, but that does not make his home an Oldham office.  If Oldham intended the restriction to apply to a representative's home area or to a specific geographic area, it could have chosen language to make that intent clear.[3]  In keeping with the close scrutiny given to non-competition clauses, and in keeping with the

---

[3] The court notes that Section 3.4 of the Non-Compete Agreement provides in part that the 200-mile restriction "represents the geographic area in which the majority of the Company's customers and business contacts for which [employee] is responsible are located."  This language is non-specific, however, and may well refer to the Springfield, Missouri, area, given that the Non-Compete Agreement was signed in conjunction with defendant's appointment as General Manager of Oldham's Springfield Branch office.

principle that any ambiguities must be construed against the drafter of an agreement, *see Bishop v. Lakeland Animal Hosp.*, 644 N.E.2d 33, 36 (Ill. App. Ct. 1994), the court concludes that the term "Oldham Graphic Supply Office" does not apply to residential offices of Oldham sales representatives. It applies only to branch offices owned or operated by Oldham at the time of the execution of the defendant's Non-Compete Agreement. And under the evidence presented the only current threat of competition concerns the Springfield, Missouri office. Accordingly, the 200-mile restriction of Section 3.2 of the Non-Compete Agreement does not apply to the Wichita, Kansas, area, where Oldham maintains no branch office.

Cornwell also contends that the two-year time restriction in the Non-Compete Agreement is unreasonable. As plaintiff points out, Illinois courts have frequently upheld two and three-year time restrictions on competition as being reasonable. *See Health Professionals, Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. Ct. 2003). *Cf. Decker, Berta & Co., Ltd. v. Berta*, 587 N.E.2d 72, 77 (Ill. App. Ct. 1992) (noting empirical study showing average time restriction found reasonable was 21.3 months, while "clauses approaching two years rest on more uncertain ground."). Nevertheless, the court is persuaded that the nature of the graphic arts industry and the defendant's position as a sales representative make a two-year restriction on competition unreasonable in this case. The evidence showed that in this industry the driving factor for customers is cost. It also showed that costs are constantly changing and that customers are willing to switch vendors to obtain better prices. Finally, while the evidence showed that the defendant's position with Oldham allowed him access to sensitive cost information and gave him an opportunity to build goodwill with Oldham's customers, the competitive advantage resulting from these factors is likely of fairly short duration. *Cf. Office Mates 5, North Shore, Inc. v.*

21

*Hazen*, 599 N.E.2d 1072 (Ill. App. Ct. 1992) (noting lack of protectable interest in competitive industry where customers engage in "cross-purchasing" from various vendors).  In *Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977 (C.D. Ill. 2003), the court found that two years was an unreasonable period of time for a non-compete agreement in the printing industry because prices, costs and customer information in the industry are volatile and knowledge of such information does not provide a long-lasting competitive advantage.  *Id.* at 982-83.  The court found that a one-year restriction would be the outside limit on any legitimate interest of the employer in that case.  *Id.*  The evidence in the instant case supports a similar finding.  The legitimate business interests of Oldham in preventing the defendant from engaging in unfair competition with information he derived from Oldham are limited to a one-year period from the date of his resignation.

*Alleged Material Breach of Contract by Oldham*.  Defendant's next contention is that Oldham materially breached his employment agreement by reducing his commissions, thus releasing him from any obligation to comply with the Non-Compete Agreement.  Doc. 15 at 21. Oldham, meanwhile, believes it had the right to modify the commissions because Cornwell was an at-will employee.  It points out that Cornwell continued to work for months after the reduction and it argues that "when an at-will employee continues to work after a change in [a] commission plan, he is deemed to have accepted the change."  *Citing Geary v. Telular Corp.*, 793 N.E.2d 128 (Ill. App. Ct. 2003).  Cornwell, meanwhile, contends this "acceptance" rule does not apply because the employment agreement provided it could only be modified in writing, and no written modification was agreed to by the parties.  *Citing Alexander, Inc. v. Feldman*, 913 F.Supp. 1495 (D. Kan. 1996).

22

A material breach of a contract can operate to discharge the duties of a covenant not to compete.  *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 72 (Ill. 2006); *Virendra S. Bisla, M.D., Ltd. v. Parvaiz*, 884 N.E.2d 790 (Ill. App. Ct. 2008).  "Whether a breach is material involves a determination of 'whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage consider[ ] such a breach to be material, and whether the allowance of reciprocal non-performance by the nonbreaching party will result in his accrual of an unreasonable or unfair advantage.'"  *Parvaiz*, 884 N.E.2d at 795 (*quoting William Blair & Co. v. FI. Liquidation Corp.*, 830 N.E.2d 760 (Ill. App. Ct. 2005)).

The *Geary* case cited by Oldham states plainly that "when an employment agreement is terminable at will, it may be modified by the employer as a condition of its continuance."  *Geary*, 793 N.E.2d at 131.  Numerous other Illinois cases say the same.  *See e.g., Ohlemeier v. Comm. Consolidated Sch. Dist. No. 90*, 502 N.E.2d 1312 (1987);  *Wyatt v. Dishong*, 469 N.E.2d 608, 611 (Ill. App. Ct. 1984) (employer's reduction in compensation did not relieve defendant of non-compete agreement; contract terminable at the will of either party can be modified at any time by either party as a condition of its continuance).  None of these cases, however, appear to discuss the effect of a provision requiring that any modification to the agreement be in writing.  In this case, the parties had a written agreement specifying the commission percentage that Cornwell would be paid, and a provision stating that no changes could be made except in a written agreement signed by the party against whom enforcement is sought.  Illinois courts would presumably seek to give effect to the intent of the parties as reflected in this type of agreement.  As applied here, the clear language of the parties' written agreement means that

Oldham gave up any right it had to *unilaterally* modify the defendant's commission.[4]

Under Illinois law, however, parties to a written contract may modify its terms by a subsequent oral agreement, *even if the terms of the contract preclude oral modification.  A.W. Wendell and Sons, Inc. v. Qazi*, 626 N.E.2d 280, 287 (Ill. App. Ct. 1993).  The existence of an oral modification, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact.  *Id.* at 288.  Similarly, Illinois courts have found that the parties may manifest assent or acceptance of a modification to an employee's compensation plan, either expressly or impliedly through their conduct.  *See Landers-Scefo v. Corp. Office Systems, Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005) (employer can manifest assent to commission arrangement by paying employee according to it, and employee can manifest assent by continuing to work).  In *Geary* it was undisputed that the plaintiff continued to work and accept commissions for approximately nine months after a change in his commission plan.  The *Geary* court found that summary judgment was appropriately granted to the employer in those circumstances.  Another case relied upon by *Geary* found that continuing to work over a two-and-a-half year period while accepting payments under a new commission plan "must be seen in legal terms as an acceptance" of the modification, "grudging and protest-filled as that acceptance may have been."  *See Schoppert v. CCTC Intern., Inc.*, 972 F.Supp. 444, 447 (N.D. Ill. 1997).

---

[4] In his testimony, Mr. Collins seemed to suggest there really was no substantive change because the commission percentage paid by Oldham stayed the same "as long as the customers paid on time and he hit his quota."  The change, however, clearly was a material alteration from the written promise Oldham made to Cornwell in the parties' At-Will Employment Agreement, which contained no reductions based on sales quotas.  It was also a highly detrimental change insofar as the defendant was concerned, given that it essentially cut his commissions in half, to a level that made his continued employment unsustainable.  Such changes may well have been required for the company to survive, as Collins suggested, but they were also at odds with the written promises Oldham previously made to Cornwell.

The *Schoppert* court noted that actions may speak louder than words in this context.  Although the Illinois cases do not state how long an at-will employee must continue to work in order to manifest assent, they strongly suggest the defendant's conduct in continuing to work for about six months after a change to his commission plan (and eight or more months after it was first announced) and his acceptance of commissions under the new plan would be deemed an acceptance of the change, even if he voiced some objections to the plan.  *See Landers-Scelfo v. Corp. Office Systems, Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005) (employers and employees can manifest their assent to conditions of employment by conduct alone).  As Oldham points out, Cornwell never asserted that the change was a breach of his contract, and he accepted commission payments under the new plan while continuing to work.  Under the circumstances, the court cannot accept defendant's claim that Oldham's change in his commission plan excuses any obligation on his part to comply with the Non-Compete Agreement.

"The enforceability of a restrictive convenant is a question of law which depends on the reasonableness of its terms," and which turns on the unique circumstances of each case.  *Smith v. Burkitt*, 795 N.E.2d 385, 394 (Ill. App. Ct. 2003).  With the limitations discussed by the court above, the court concludes that the Non-Compete Agreement is enforceable under Illinois law.  These limitations include that the restrictions in Paragraphs 3.2 and 3.3 of the Non-Compete Agreement apply for a period of only 1 year from the defendant's resignation from Oldham; the 200-mile radius in ¶ 3.2 is measured from Oldham's Springfield, Missouri, branch office, but not from the residences of its sales representatives; and the customers or clients in ¶ 3.3 that defendant is prohibited from engaging in business with are those accounts that he acquired while working at Oldham, but not those accounts that he brought to Oldham from his previous

employment.

(2).  *Likelihood that movant will suffer irreparable harm in the absence of preliminary relief.*  A threatened business interest is an identifiable right which may be protected by injunctive relief.  *Central Water Works Supply, Inc. v. Fisher*, 608 N.E.2d 618, 623 (1993).  The loss of customers and sales and the threat of the continuation of such loss to a legitimate business interest is sufficient to show that a plaintiff will suffer irreparable injury unless protected by the court.  *Id*.  Plaintiff's evidence is sufficient to show that absent preliminary injunctive relief, it is likely to suffer some irreparable harm in the form of lost customers, loss of goodwill, and unfair competition by the defendant, prior to any determination on the merits of the claims.  Plaintiff's evidence of harm goes beyond speculation and cannot be adequately measured in damages.

As the court previously noted, however, the plaintiff's legitimate business interest in this case is limited to protecting against unfair competition by the defendant within the 200-mile radius identified in the Non-Compete Agreement, and unfair competition by engaging in business with existing customers or clients of Oldham with whom the defendant had contact at Oldham and whose account or business was established or developed by Oldham.

(3) *Balance of equities*.  The court must weigh the likelihood of harm to the plaintiff against any harm likely to result to the defendant from issuance of an injunction.  The issuance of a broad injunction could have a severely detrimental impact on the defendant's ability to make a living.  The defendant has spent most of his life selling graphic arts supplies; he knows no other trade.  In addition, many of his accounts at Oldham were accounts that he had developed before he went to work for Oldham.  *Cf. Restatement (Second) of Contracts*, §188, comment c. (the harm caused to the employee may be excessive if the restraint prevents him from earning his

26

livelihood).

The court has also considered the evidence showing that the defendant likely breached ¶ 3.1 of the Non-Compete Agreement by engaging in direct competition with Oldham even while he was still employed by that company.  He did so after Oldham had cut his commissions to a level that made it impossible for him to earn a living while working at Oldham.

With the significant limitations imposed by the court on the injunctive relief requested by Oldham, the court concludes that the legitimate interests of Oldham will be protected and the defendant will still be able to earn a living.  The court finds that this limited injunctive relief appropriately balances the harms to the respective parties and the public interest.

(4) *Public Interest*.    There is a valid public interest in enforcing valid contracts, as well as in protecting legitimate business interests and the efforts of one's labors.  The public interest also favors free and fair competition, and disfavors unreasonable restraints on trade.  The court concludes that the limited injunctive relief granted in this case will not be injurious to the public interest.

Finally, the court determines that the limited injunctive relief granted in this case makes unnecessary the posting of any bond for security.

**IV. <u>Conclusion</u>**.

Plaintiff Oldham's Motion for Preliminary Injunction (Doc. 4) is GRANTED IN PART as follows.

Pending the completion of arbitration or until further order of the court, the defendant Charles David Cornwell is hereby enjoined and prohibited from:

1.  Directly or indirectly entering into or engaging in a business or activity which competes, directly, indirectly, or in any manner whatsoever, with Oldham's business, either as an individual for his own account or as an employee, agent, officer, director, or member of any association, corporation, partnership, firm or business entity of any type, within a 200-mile radius of the Oldham Graphic Supply office in Springfield, Missouri; and

2.  Directly or indirectly entering into or engaging in any business or activity with any customers or clients or clients of Oldham, with whom Cornwell had contact while working for Oldham, except for those customers or clients with whom Cornwell had an established sales relationship prior to his employment with Oldham.  The clients or customers that defendant shall not engage in business with include Rand Graphics, The Envelope Guys, and Docuplex.

The foregoing restrictions shall expire and cease to be of any effect on July 1, 2010, if they are not otherwise altered before that date.

IT IS SO ORDERED this  17th    Day of September, 2009, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge